IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EDWINA HUDSON, | ) |
| *Plaintiff,* | ) Case No. |
| v. | ) JURY DEMANDED |
| CREATIVE DINING SERVICES, INC., | ) |
| *Defendant.* | ) |

# COMPLAINT

Plaintiff Edwina Hudson ("Hudson" or "Plaintiff"), complains against her former employer, Defendant Creative Dining Services, Inc. ("CDS" or "Defendant"), for its failure to pay her earned but unpaid overtime wages under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA"), and the Illinois Minimum Wage Law, 820 ILCS 105/1, *et seq.* ("IMWL"); and for discrimination and retaliation based on Plaintiff's request for an accommodation due to a known disability in violation of the Illinois Human Rights Act, 775 ILCS 5/1, *et seq.* In support of her claims, Hudson states as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question); 29 U.S.C. § 216(b) (FLSA), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

2. Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(1), (2) (venue generally) and 29 U.S.C. § 216(b) (FLSA).

3. Defendant regularly conducts business in this District.

## PARTIES

4. Plaintiff Edwina Hudson is an individual residing in Lansing, Cook County, Illinois.

5. Defendant Creative Dining Services, Inc., is a Michigan-based for-profit corporation that does business in Illinois, and throughout the United States.

1

6. CDS is engaged in the production, distribution, and retail sale of food products in Illinois across the United States. CDS maintains its principal offices in Zeeland, Michigan.

7. Defendant partners with academic institutions and corporations to operate dining centers, corporate cafes, catered events, markets, coffee shops, and concessions in Illinois and the United States.

8. CDS is a business with at least $500,000 in annual gross sales or revenues in 2022.

9. At all relevant times herein, Defendant was an "employer," as defined by the FLSA, the IMWL, and the IHRA. 29 U.S.C. § 203(e)(1); 820 ILCS 105/3(c); 775 ILCS 5/2-101(B)(1)(a)-(b).

10. At all relevant times herein, Hudson was CDS's "employee" as defined by the FLSA, the IMWL, and the IHRA. 29 U.S.C. § 203(e)(1); 820 ILCS 105/3(d); 775 ILCS 5/2-101(B)(1)(a)-(b).

## ADMINISTRATIVE EXHAUSTION

11. On or around May 30, 2023, Hudson submitted a Charge of Discrimination with the Illinois Department of Human Rights ("IDHR"), Charge No. 2023CF1174, alleging CDS failed to accommodate her request for a disability and did not engage in the interactive process, discriminated against her due to her disability, and retaliated against her based on her request for an accommodation due to a disability. On June 26, 2023, Hudson submitted an Amended Charge to IDHR, which added allegations related to her retaliation claim. *See* **Exhibit 1**.

12. On February 15, 2024, the IDHR issued a Notice Dismissal to Hudson, which advised Hudson of her right to "[c]ommence a civil action in the appropriate state circuit court within ninety (90) days after receipt of this Notice. *See* **Exhibit 2**.

## RELEVANT FLSA MAXIMUM HOURS AND EXEMPTION LAWS AND REGULATIONS

13. The FLSA provides that non-exempted employees shall not work in excess of 40 hours in any particular workweek, "unless such employee receives compensation for his employment in

excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

14. The FLSA provides that its overtime and minimum wage protections do not apply to "any employee employed in a bona fide executive, administrative, or professional capacity …, or in the capacity of outside salesman …." 29 U.S.C. § 213(a)(1).

15. The U.S. Department of Labor has promulgated regulations defining the criteria necessary to meet the "bona fide executive" exemption under the FLSA:

> (a) The term "employee employed in a bona fide executive capacity" in section 13(a)(1) of the Act shall mean any employee:
>
> (1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week (or $455 per week if employed in the Commonwealth of the Northern Mariana Islands, Guam, Puerto Rico, or the U.S. Virgin Islands by employers other than the Federal government, or $380 per week if employed in American Samoa by employers other than the Federal government), exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100.

16. All four criteria set forth in 29 C.F.R. § 541.100 must be met for an employee to be exempt under the FLSA's bona fide executive exemption.

17. According to the FLSA and its regulations, an employee is considered exempt from the FLSA's overtime and minimum wage provisions if the employee's "primary duty" is the performance of exempt work. Otherwise, the employee is considered non-exempt under the FLSA:

> (a) To qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work. The term "primary duty" means the principal, main,

3

major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a).

18. Although "[t]ime alone … is not the sole test" to determine whether an employee is exempt, "[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." 29 C.F.R. § 541.700(b).

19. FLSA regulations set forth guideposts to help a factfinder determine whether an employee's suggestions and recommendations are given "particular weight" under 29 C.F.R. § 541.100(a)(4):

> To determine whether an employee's suggestions and recommendations are given "particular weight," factors to be considered include, but are not limited to, whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon. Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs. It does not include an occasional suggestion with regard to the change in status of a co-worker. An employee's suggestions and recommendations may still be deemed to have "particular weight" even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status.

29 C.F.R. § 541.105.

20. FLSA regulations provide guidance in situations where an employee is classified as exempt under the bona fide executive, but also performs both exempt and non-exempt work:

> Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption if the requirements of §541.100 are otherwise

4

met. Whether an employee meets the requirements of §541.100 when the employee performs concurrent duties is determined on a case-by-case basis and based on the factors set forth in §541.700. Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work. In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods. An employee whose primary duty is ordinary production work or routine, recurrent or repetitive tasks cannot qualify for exemption as an executive.

29 C.F.R. § 541.106.

## FACTS

<u>CDS Hires Hudson and Misclassifies Her as a Non-Exempt Production Manager</u>

21. CDS provides hospitality, catering, and dining services to colleges and universities.

22. At all relevant times herein, CDS operated a cafeteria and managed dining services at Trinity Christian College ("Trinity"), located at 6601 West College Drive, Palos Heights, Cook County, Illinois.

23. Hudson was employed by CDS from January 10, 2022, through December 7, 2022, when she was unlawfully terminated.

24. CDS hired Hudson as a Production Manager to work at Trinity.

25. Hudson worked at Trinity throughout her employment with CDS.

26. CDS classified Hudson as an exempt employee under the FLSA.

27. Hudson earned a salary during her entire employment with CDS.

28. Hudson regularly worked between 50 and 70 hours per week throughout her employment with CDS.

29. CDS never compensated Hudson with overtime pay under the FLSA and IMWL for any hours that she worked over 40 in a given workweek.

30. During her pre-hire interview for the Production Manager position, Hudson's eventual supervisor, John West, told Hudson that she could make her own schedule, and that her typical work week would consist of 40 hours.

31. Soon after Hudson was hired on January 10, 2022, West told Hudson that CDS expected managers like her to work ten and 12 hours a day, six or seven days per week. This statement contradicted what West had told Hudson during her pre-hire interview.

32. CDS's cafeteria was short-staffed throughout Hudson's employment.

33. CDS failed to remedy the short staffing throughout Hudson's employment.

34. Throughout her employment with CDS, Hudson had no authority to hire additional staff to fill the vacant positions at Trinity.

35. Rather than remedying the severe short-staffing problem, CDS directed Hudson to do work typically done by hourly, non-exempt employees.

36. CDS benefitted from keeping its Trinity facilities short-staffed because it avoided having to pay the wages of additional employees, and it was able to push non-exempt work to Hudson without paying her any overtime wages.

37. For example, Hudson cooked, washed dishes, cleaned the cafeteria, worked the register, bussed tables, served, and assisted with catered events.

38. Each of the above tasks was typically performed by hourly that employees CDS typically classified as non-exempt under the FLSA.

39. As a result of CDS's chronic failure to adequately staff its operations at Trinity, Hudson was required to work an average of 50-70 hours per week performing work that hourly non-exempt employees were supposed to perform.

6

40. Throughout her employment with CDS, Hudson's primary duty was the performance of non-exempt work, including but not limited to cooking, washing dishes, cleaning the cafeteria, working the register, bussing tables, serving, and assisting with catered events.

41. Indeed, for the vast majority of her employment with CDS, approximately 80% of her time spent working was performing work that should have been performed by non-exempt employees.

42. Hudson had no authority to hire or fire other CDS employees throughout her employment with CDS.

43. Hudson's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other CDS employees were not given particular weight.

44. For example, in July 2022, Hudson's supervisor John West scheduled interviews and interviewed the applicants. Hudson then had the chance to speak with the applicants. After the interview process had concluded, West directed Hudson to extend offers of employment to everybody that was interviewed because "some bodies are better than no bodies."

45. Hudson did not have the opportunity to lodge her suggestions or recommendations as to the hire of any of the applicants.

46. Every one of the applicants that accepted employment with CDS either quit or was terminated by November 2022.

47. In another instance, Hudson was told by a current-CDS employee that he would be promoted to the role of sous chef. Hudson had no involvement in the sous chef's promotion. Hudson later discovered from working with him that he had limited experience and was not knowledgeable enough for the requirements of the position.

48. In September or October of 2022, Trinity's interim director promoted and gave pay increases to certain CDS employees without consulting Hudson about their work performance.

49. In October 2022, CDS's Human Resources Representative Jill Bancheri visited Trinity and suspended an employee during an investigation into the employee's conduct. The employee was eventually

7

terminated. Nobody from CDS asked for Hudson's suggestions or recommendations as to whether the employee should be terminated.

50. In November 2022, Bancheri visited Trinity to interview a potential CDS employee. CDS hired the applicant. CDS never sought any feedback from Hudson regarding the new employee's hire.

51. Upon the new employee's hire in November 2022, Bancheri and Hudson's supervisor Scott Van Deraa told Hudson that the new employee wanted to work the opening shift. Hudson responded that the opening shift was already filled and that Trinity needed someone who could close.

52. Bancheri and Van Deraa ignored Hudson's recommendations. Instead, Bancheri and Van Deraa then directed Hudson to create an early morning shift for the new employee to ensure she would except the job offer.

CDS Misclassified Hudson as a Non-Exempt Bona Fide Executive Under the FLSA.

53. CDS misclassified Hudson as a bona fide executive under the FLSA throughout her employment.

54. Hudson's primary duty was not the management of CDS or a department or subdivision thereof. Rather, Hudson's primary duty was performing work typically performed by non-exempt employees.

55. Additionally, Hudson did not have any authority to hire or fire employees. Further, Hudson's suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees were not given particular weight.

Hudson Suffered Unlawful Discrimination and Retaliation Under the IHRA

56. Hudson performed her job well throughout her employment with CDS.

57. Hudson received no formal discipline while being an employee with CDS.

58. Hudson began to suffer significant pain in her right leg in February of 2022.

59. Hudson's leg pain continued throughout her employment.

60. In September or October of 2022, Hudson severe leg pain caused her to walk with a limp and prop her leg up for temporary pain relief.

61. Hudson's supervisors noticed Hudson's apparent difficulty due to her leg pain.

62. By December 2022, the condition Hudson's leg had worsened, due in part to the long hours that Hudson was working but was not receiving compensated with overtime pay under the FLSA and IMWL.

63. During the evening of December 4, 2022, Hudson emailed her supervisors, Matt Aspinall and Scott Van Deraa, stating in part:

> I really must put my health first or I will be no use to my family or CDS. My plan is to work my required time fulfilling my responsibilities and trusting the staff to do their job for the rest of the day until Christmas break. I will also be making several doctor appointments to check on my leg as well as other health related issues I have been dealing with, as this pain is becoming unbearable….

64. CDS never accommodated Hudson's request for an accommodation in the form of a modified work schedule.

65. CDS and its agents failed to engage in an interactive process regarding her request for a modified work schedule.

66. Instead, on December 7, 2022, Aspinall met with Hudson and informed her that her employment was being terminated. Aspinall conveyed to Hudson that her termination was due to performance issues.

67. CDS's rationale for Hudson's termination was a pretext to a discriminatory and retaliatory purpose.

68. In fact, Hudson had never been disciplined for poor performance throughout her employment with CDS, either formally or informally.

69. Hudson was terminated because of her apparent disability, and in retaliation for requesting an accommodation.

9

## COUNT I – FLSA
## MISCLASSIFICATION AND FAILURE TO PAY OVERTIME WAGES

70. All foregoing Paragraphs are incorporated by reference herein.

71. CDS is an "employer" pursuant to the FLSA. 29 U.S.C. § 203(e)(1).

72. Hudson was an "employee" pursuant to the FLSA. 29 U.S.C. § 203(e)(1).

73. CDS hired Hudson to be a Production Manager.

74. CDS paid Hudson a salary, and classified her as exempt under the FLSA.

75. Throughout her employment, Hudson's primary duties consisted of performing non-exempt work, including but not limited to cooking, washing dishes, cleaning the cafeteria, working the register, bussing tables, and serving.

76. Because Hudson's primary duty as a CDS employee consisted of non-exempt work, she should have been classified as a non-exempt employee under the FLSA.

77. Hudson was misclassified as an exempt employee under the FLSA.

78. Hudson generally worked 50-70 hours on average per workweek.

79. CDS never compensated Hudson for any of the hours that she worked over 40 in any workweek.

80. Hudson was damaged as a result of CDS's failure to pay her overtime wages.

## COUNT II – IMWL
## MISCLASSIFICATION AND FAILURE TO PAY OVERTIME WAGES

81. All foregoing Paragraphs are incorporated by reference herein.

82. CDS is an "employer" pursuant to the IMWL. 820 ILCS 105/3(c).

83. Hudson was an "employee" pursuant to the IMWL. 820 ILCS 105/3(d).

84. CDS hired Hudson to be a Production Manager.

85. CDS paid Hudson a salary, and classified her as exempt under the IMWL.

86. Throughout her employment, Hudson's primary duties consisted of performing non-

10

exempt work, including but not limited to cooking, washing dishes, cleaning the cafeteria, working the register, bussing tables, and serving.

87. Because Hudson's primary duty as a CDS employee consisted of non-exempt work, she should have been classified as a non-exempt employee under the IMWL.

88. Hudson was misclassified as an exempt employee under the IMWL.

89. Hudson worked 50-70 hours on average per workweek.

90. CDS never compensated Hudson for any of the hours that she worked over 40 in any workweek, which occurred between [DATE] AND [DATE].

91. Hudson was damaged as a result of CDS's failure to pay her overtime wages.

## COUNT III – IHRA
## DISCRIMINATION BASED ON DISABILITY – FAILURE TO ACCOMMODATE

92. All foregoing Paragraphs are incorporated by reference herein.

93. CDS is an "employer" under the IHRA. 775 ILCS 5/2-101(B)(1)(a)-(b).

94. Hudson was CDS's "employee" at all relevant times under the IHRA. 775 ILCS 5/2-101(B)(1)(a)-(b). Hudson had an actual or perceived physical "disability" as that term is defined under the IHRA, 775 ILCS 5/1-103(I)(1)(a).

95. On December 4, 2022, Hudson requested a reasonable accommodation due to her physical disability. Specifically, she requested that she work only her regularly scheduled hours until Christmas, a period of less than three weeks.

96. Hudson was able to perform her job duties with or without the accommodation.

97. CDS failed to provide the requested accommodation to Hudson.

98. CDS failed to engage with Hudson to determine a suitable accommodation.

99. Providing a reasonable accommodation to Hudson would not have created an undue hardship for CDS.

100. On December 7, 2022, CDS terminated Hudson's employment.

101. CDS's stated reasons for Hudson's termination were untrue.

102. CDS's stated reasons for Hudson's termination were a pretext to a discriminatory purpose.

103. CDS terminated Hudson's employment because of her actual or perceived physical disability, and because she requested a reasonable accommodation.

104. Hudson has been damaged by CDS's failure to accommodate her physical disability.

## COUNT IV – IHRA
## DISCRIMINATION BASED ON DISABILITY – DISCHARGE

105. All foregoing Paragraphs are incorporated by reference herein.

106. CDS is an "employer" under the IHRA. 775 ILCS 5/2-101(B)(1)(a)-(b).

107. Hudson was CDS's "employee" at all relevant times under the IHRA. 775 ILCS 5/2-101(B)(1)(a)-(b).

108. Hudson had an actual or perceived physical "disability" as that term is defined under the IHRA, 775 ILCS 5/1-103(I)(1)(a).

109. On December 4, 2022, Hudson requested a reasonable accommodation due to her physical disability. Specifically, she requested that she work only her scheduled hours until Christmas, a period of less than three weeks.

110. Hudson was able to perform her job duties with or without the accommodation.

111. CDS failed to provide the requested accommodation to Hudson.

112. CDS failed to engage with Hudson to determine a suitable accommodation.

113. Providing a reasonable accommodation to Hudson would not have created an undue hardship for CDS.

114. On December 7, 2022, just three days after Hudson requested an accommodation, CDS terminated Hudson's employment.

115. CDS's stated reasons for Hudson's termination were untrue.

116. CDS's stated reasons for Hudson's termination were a pretext to a discriminatory purpose.

117. CDS's terminated Hudson's employment due to her known actual or perceived physical disability, and because she requested a reasonable accommodation.

118. Hudson has been damaged by CDS's discriminatory discharge.

## COUNT V – IHRA
## RETALIATION BASED ON REQUEST FOR ACCOMMODATION – DISCHARGE

119. All foregoing Paragraphs are incorporated by reference herein.

120. CDS is an "employer" under the IHRA. 775 ILCS 5/2-101(B)(1)(a)-(b).

121. Hudson was CDS's "employee" at all relevant times under the IHRA. 775 ILCS 5/2-101(B)(1)(a)-(b). Hudson had an actual or perceived physical "disability" as that term is defined under the IHRA, 775 ILCS 5/1-103(I)(1)(a).

122. On December 4, 2022, Hudson requested a reasonable accommodation due to her physical disability. Specifically, she requested that she work only her regularly scheduled hours until Christmas, a period of less than three weeks.

123. Requesting a reasonable accommodation due to a physical disability is protected activity under the IHRA.

124. Hudson was able to perform her job duties with or without the accommodation.

125. CDS failed to provide the requested accommodation to Hudson.

126. CDS failed to engage with Hudson to determine a suitable accommodation.

127. Providing a reasonable accommodation to Hudson would not have created an undue hardship for CDS.

128. On December 7, 2022, CDS terminated Hudson's employment.

129. CDS's stated reasons for Hudson's termination were untrue.

130. CDS's stated reasons for Hudson's termination were a pretext to a retaliatory purpose.

131. CDS terminated Hudson's employment because of her actual or perceived physical disability, and because she requested a reasonable accommodation.

132. Hudson has been damaged by CDS's retaliation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Edwina Hudson respectfully request that this Court enter an order in her favor and against Defendant Creative Dining Services, Inc. as to Counts I, II, III, IV, and V, and order the following relief:

a) Awarding judgment in an amount equal to all unpaid back pay owed to Plaintiff pursuant to the FLSA and the IMWL;

b) Awarding prejudgment interest on the back pay in accordance with the FLSA and the IMWL, 815 ILCS 205/2;

c) Awarding statutory damages pursuant to the formula set forth in the IMWL, 820 ILCS 105/12(a);

d) Awarding liquidated damages in an amount equal to the amount of unpaid overtime compensation found due pursuant to the FLSA, 29 U.S.C. § 216(b);

e) Awarding treble damages as provided by the IMWL, 820 ILCS 105/12(a);

f) Entering an injunction precluding Defendants from violating the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*;

g) Awarding backpay arising from Hudson's discriminatory and retaliatory discharge under the IHRA;

h) Awarding front pay arising from Hudson's discriminatory and retaliatory discharge under the IHRA;

i) Awarding compensatory damages, including but not limited to Hudson's emotional distress and mental anguish arising from being subjected to discrimination and retaliation under the IHRA as alleged herein;

j) Awarding reasonable attorneys' fees and costs incurred in filing this action, as provided by the FLSA, the IMWL, and the IHRA; and

k) Ordering such other and further relief as this Court deems appropriate and just.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all claims so triable.

Respectfully submitted,

/s/ *Alexandros Stamatoglou*
One of Plaintiffs' Attorneys

Garfinkel Group, LLC
701 N. Milwaukee Avenue, The CIVITAS
Chicago, IL 60642
Alexandros Stamatoglou (IARDC No. 6308169)
alex@garfinkelgroup.com
t: (312) 736-7991
f: (312) 549-9623